**UNITED STATES of America, Appellant,**

v.

**William F. SCHOENHUT, Jr.**

No. 77–1793.

United States Court of Appeals, Third Circuit.

Argued Jan. 3, 1978.

Decided April 17, 1978.

As Amended May 15, 1978.

---

David W. Marston, U. S. Atty., Walter S. Batty, Jr., Peter J. Smith, Asst. U. S. Attys., Philadelphia, Pa., for appellant.

Morris Paul Baran, Philadelphia, Pa., for appellee.

Before ROSENN and HIGGINBOTHAM, Circuit Judges, and BARLOW, District Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

In response to a lack of public trust in banking fostered during the Great Depression, Congress enacted legislation to protect the integrity of federally insured banks. Criminal penalties were included in this legislation to prevent actions of bank officers and other employees contrary to the public interest. The defendant, William F. Schoenhut, Jr., an officer of a federally insured bank, was found guilty by a jury of five counts of an indictment charging him with violations of his duty to the bank and the public. Following the verdict, the district judge granted a judgment of acquittal in favor of defendant on all five counts.[1] We vacate that judgment, reinstating the verdict as to three of the counts.

## I. FACTS

██ This was a complicated criminal action arising out of intricate banking transactions, generated by avarice, and aided by an executive employee's deception and disloyalty. A brief description of the facts adduced at trial is essential to assess the district court's judgment. Because this is an appeal from a judgment of acquittal, the Government is entitled to have the evidence viewed in the light most favorable to the verdict. *See United States v. Anderson,* 532 F.2d 1218, 1223 (9th Cir. 1976); *United States v. Schmidt,* 471 F.2d 385, 385–86 (3d Cir. 1972) (per curiam), *citing, United States v. Feldman,* 425 F.2d 688, 692 (3d Cir. 1970).

Taking the evidence in the light most favorable to the Government, the jury could have found the following. From sometime in 1972 until August of 1973, the defendant served as an Assistant Vice President in the mortgage department of Central Penn National Bank ("Central Penn") under the immediate supervision of the Vice President, John Jacobsen. In September of 1973, defendant succeeded Mr. Jacobsen as the head of the mortgage department and was charged with responsibility for the day-to-day operations of the department, administration, and the origination of new business. During this period, defendant had substantial dealings with H. Gerard Heimbecker, David Pierce, Ronald Nirenberg, and Philip Inverso, all of whom were officers or employees of Delaware Valley Mortgage and Realty Corporation ("Delaware Valley"), a customer of Central Penn's mortgage department.

Delaware Valley was a mortgage broker which had its principal office in Philadelphia, Pennsylvania, with at least one branch office located in Wilmington, Delaware. It was wholly owned by a parent firm known as Mullin and Lonergan, Associates, but was managed by Heimbecker, Nirenberg, and Inverso who reported to the parent. Delaware Valley was in the business of buying, selling, and servicing of mortgages, and to a lesser extent, the financing of construction projects. Generally, it acted as a middle man, purchasing mortgages through realtors and other agents at a certain interest rate and then reselling them at a lower interest rate to financial institutions, which would act as the permanent lenders.

Delaware Valley purchased mortgages only on an interim basis, between the time of settlement on the real estate and the eventual sale of the mortgage to a permanent lender. In this period it needed extensive amounts of capital to finance its short

---

* George H. Barlow, United States District Judge for the District of New Jersey, sitting by designation.

1. Defendant was convicted of: count I, receiving a fee for procuring a loan from the bank, in violation of 18 U.S.C. § 215 (1976); count III, willful misapplication of the bank's funds, in violation of 18 U.S.C. § 656 (1976); count VI, submission of false documents to the bank, in violation of 18 U.S.C. § 1005 (1976); count VIII, submission of false reports to the bank, in violation of 18 U.S.C. § 1005 (1976); and count IX, conspiracy, in violation of 18 U.S.C. § 371 (1976). The Government does not appeal the judgment of acquittal on count VI.

term purchases. To obtain such financing, Delaware Valley entered into a mortgage warehousing agreement with Central Penn.

Mortgage warehousing is a form of extension of credit whereby institutions such as Delaware Valley obtain financing from banks on a short term basis, using mortgages as collateral. Under this system, Central Penn established a line of credit for Delaware Valley in 1972—initially $500,000, subsequently raised to $2,000,000—which allowed Delaware Valley quick access to short term financing. At settlement on the purchase of a parcel of property, Delaware Valley would write out a check on the warehouse account, not to exceed its credit limit, to accomplish closing. This check, along with a demand collateral note in Central Penn's name, the mortgage agreement between Delaware Valley and the mortgagee, other required papers, and a commitment letter from a permanent lender indicating permanent financing for the project, would then be sent to the bank. Whenever the permanent lender purchased the mortgage from Delaware Valley, the Central Penn loan would be repaid, the mortgage transferred to the permanent lender, and the appropriate amount reinstated to the credit line. Testimony indicated that the Central Penn mortgage department handled the Delaware Valley warehouse line and that the defendant had supervisory responsibility to insure the proper operation of the department.[2]

Sometime in the spring of 1973, David Pierce, the manager of the Delaware branch of Delaware Valley, advised Heimbecker, Inverso, and Nirenberg that there was a parcel of land in Smyrna, Delaware, owned by the Karlee Corporation ("Karlee"), which would be suitable for development by Delaware Valley. On past occasions, Delaware Valley had purchased such undeveloped land with the intention of finding builders to construct homes on the

sites. On this occasion, however, Heimbecker, Inverso, Nirenberg, and Pierce, all of whom were either officers or employees of Delaware Valley at the time, decided that they would attempt to develop the land themselves for their personal profit. They thought they could obtain financing for this project, both for the purchase of the new land and the construction of the homes, directly from Central Penn.

The defendant was brought into this venture sometime in the spring of 1973. He made inspections of the building site and had discussions with Heimbecker and the others about methods of financing the project. He made it clear that Central Penn could not grant a loan on the project directly to Heimbecker and his associates. The exact reason for this is not certain. Defendant suggested that the loan could not be made because the land was too far from Central Penn for adequate inspections, but it appears more likely that the actual reason the bank would not make the loan was because the officers had contributed only minimal capital to the project and the property constituted mere raw land. Instead, defendant agreed with and supported Heimbecker's proposal that they manipulate the Delaware Valley mortgage warehouse line to finance the purchase and development of the land.

Later that spring, Heimbecker, Pierce, Inverso, and Nirenberg formed the Greenmeadow Holding Company ("Greenmeadow"), a corporation whose sole purpose was to purchase the capital stock of Karlee and thereby acquire control of its land. Shares in Greenmeadow were allotted to each of these individuals and to the defendant. The exact allocation at the time of formation was disputed, but taking the evidence in the light most favorable to the Government, it appears that the defendant initially received a 10 percent share of the stock while the others each received 22.5

---

2. The district court was most concerned with the failure of the Government to introduce documentary proof of the operation of the warehouse line. *United States v. Schoenhut*, 432 F.Supp. 470, 472 (E.D.Pa.1977). However, sufficient testimony of reliable witnesses established the line's operational features. Mr. Jacobsen, Mr. Inverso, and the defendant all testified as to the structure of the Central Penn-Delaware Valley participation, including the requirement of a bona-fide commitment letter and the supervisory role of the defendant.

percent. Eventually, defendant's share was put in parity with the other shareholders.[3]

On July 19, 1973, settlement was held in Philadelphia at which Greenmeadow purchased all of the Karlee stock. As security for this sale, the Greenmeadow principals, including the defendant, pledged the Karlee stock to its former owners.[4] That same afternoon, Delaware Valley granted a construction loan to Karlee in the amount of $1,495,400, holding a mortgage on the Greenmeadow/Karlee property as security. All of the documents evidencing this transaction were signed falsely by persons purporting to be the Greenmeadow principals. These forgeries were made to prevent Mullin and Lonergan Associates from discovering that Delaware Valley officers had a financial interest in Greenmeadow and that they were involved in the construction loan from Delaware Valley. Defendant had no knowledge of these forgeries, although he certainly understood that the principals of Greenmeadow were in fact the officers of Delaware Valley.

In connection with this settlement, Delaware Valley drew a check on its warehouse account for $150,750 to be used by Greenmeadow to purchase the Karlee stock. This check was secured by the mortgage between Delaware Valley and Greenmeadow/Karlee. All of the documents between Greenmeadow/Karlee and Delaware Valley, including the fraudulent loan papers, were forwarded to Central Penn as part of the warehouse line transaction. On July 20, 1973, Central Penn's mortgage department credited Delaware Valley's warehouse account with $150,750 as an advance on stage one of the Greenmeadow/Karlee construction loan.

On August 15, 1973, Nirenberg initiated a request to Central Penn for another advance of $90,450, purportedly for use in construction of water and sewer lines in the Karlee development. Central Penn wired funds directly to a Karlee account at another bank, even though the request was made through the Delaware Valley warehouse account. Apparently, Nirenberg, Heimbecker, and Inverso diverted the use of those funds for their own personal purposes and did not fully expend the sums on the development. The evidence established with certainty that between July 1973 and August 1974 Central Penn actually paid out approximately $620,000 on account of the loan through the warehouse line.

In late September 1973, a routine audit of the mortgage department at Central Penn disclosed that certain of the commitment letters submitted to the bank by Delaware Valley as security for various transactions financed through the warehouse line had expired. The defendant, upon being notified of this problem, promised to rectify the situation. A follow-up audit revealed that sometime after September defendant postdated several Delaware Valley collateral notes so that they fell due five days before the expiration of the commitment letters.

After the initial audit, defendant met with Heimbecker to discuss the auditor's discovery of the expired commitment letters. Defendant agreed to talk to the bank to see if he could arrange that extra time be given to Delaware Valley to enable it to work out its problems.[5] He told his superi-

---

**3.** Although defendant made no capital contribution to Greenmeadow, he received shares in the company. He testified that this was a gift from Heimbecker because of their past relationship; however, hearsay testimony was introduced at trial that Heimbecker told the others that the defendant was given his initial shares because of his efforts in securing the loan for Greenmeadow through the Delaware Valley warehouse line. Defendant later was made an equal shareholder as compensation for later services rendered to the others. *See* n. 5, *infra.*

**4.** Greenmeadow had no other assets beside the Karlee stock and a small amount of up-front money provided by Nirenberg.

**5.** Pierce testified that Nirenberg told him that the defendant's share in Greenmeadow was increased because of his intervention on behalf of the other Greenmeadow principals during the audit at Central Penn. Nirenberg stated that Heimbecker told him that the increase was to equalize the defendant's share of Greenmeadow with the others. Inverso testified as well to the equalization of the number of shares stating that Heimbecker told him that the defendant would make every effort to help re-

ors that there was a problem with the Delaware Valley warehouse line, that certain mortgages were supported with improper commitment letters. Defendant misinformed the bank that the problem was not with Delaware Valley. Based on this assurance, the bank gave an extension of time to Delaware Valley to correct the problem. Subsequently, a further extension was given.

On October 4, 1973, defendant wrote a memorandum to his bank superiors that indicated the Delaware Valley problem had been caused by "an overzealous employee" of one of the permanent lending institutions. Truthfully, as was discovered later, it was Delaware Valley's officers that had committed extensive irregularities involving false commitment letters, and who had submitted fraudulent requests on construction loans as well, including false claims for the Karlee site.

Only three sample homes were ever completed at the Karlee development. No inspections were ever made by Central Penn after the funds were forwarded to Delaware Valley on the warehouse line.[6] In order to obtain loan advances, Karlee and Delaware Valley were required to submit sales agreements on homes built and sold on the site. Nirenberg submitted fictitious agreements to obtain money from the bank. Furthermore, Nirenberg and Inverso had also embezzled money from Delaware Valley through a scheme involving false mortgage documents, which although discovered by Heimbecker in 1973, was not disclosed to the bank for another year. Funds advanced by Central Penn for Karlee through the Delaware Valley line were frequently converted by Nirenberg and Inverso to make restitution to Delaware Valley for the other embezzlements.

On November 23, 1973, the defendant answered a conflict of interest questionnaire distributed by the bank. He stated that he did not have any interest, financial or otherwise, in any customer of the bank; that he did not receive any gifts or benefits from any customer of Central Penn; and he denied that he had acquired any stock, securities, or property available to him solely because of his employment with Central Penn.

In August of 1974, defendant revealed to the bank for the first time his interest in the Greenmeadow/Karlee group. His employment was terminated shortly thereafter. Eventually, after the entire scheme was uncovered, the bank foreclosed on the Karlee development and suffered substantial losses on the project.

With this factual background, defendant was convicted of the following counts of the indictment:

(1) *Count I*—knowingly and unlawfully receiving stock in Greenmeadow for endeavoring to procure a loan from Central Penn to Karlee through the Delaware Valley warehousing line;

---

solve the audit problem. Inverso further testified that as a result of defendant's actions, the defendant was to receive an equal amount of stock—increased from a 10 percent share to a 20 percent share. All of this testimony was admitted at trial, along with certain other hearsay testimony of Heimbecker, *see* n. 3, *supra*, under the theory that the statements of co-conspirators may be admissible against the others once the existence of the conspiracy is independently demonstrated. The trial judge in his opinion on the judgment of acquittal disregarded this testimony because he concluded that there was insufficient independent foundation for proof of the conspiracy. *United States v. Schoenhut, supra,* 432 F.Supp. at 481–82. We hold later in this opinion that the testimony was admissible and that proof of the conspiracy was independently established. *See* part V, *infra*.

**6.** Testimony at trial indicated that Central Penn would customarily inspect only the sites of companies which received direct construction loans from the bank. Other testimony, however, indicated that even in the case of a construction loan made through another company's warehouse line, the bank could make inspections, although ordinarily it would look first to the primary debtor on the line. Defendant, as the head of the bank's mortgage department prepared a manual on the bank's construction loan and inspection policies. The manual provided explicit instructions for bank procedures and inspections and stated that deviations would have to be approved in person by William F. Schoenhut, Jr., the defendant. The manual applied to all loans made on warehouse lines.

(2) *Count III*—knowingly and unlawfully misapplying the funds of Central Penn in arranging the loan to Karlee and knowing of the forged documentation for the transaction;

(3) *Count VI*—knowledge of forged documents sent in an official report to the bank with intent to commit a fraud;

(4) *Count VIII*—making false statements in an official report of the bank with intent to commit a fraud by denying receipt of a gift of stock by a bank customer or by denying receipt of a gift made solely because of his position at the bank; and

(5) *Count IX*—conspiracy to do the above mentioned acts.

The defendant moved for judgment of acquittal on all counts. The district court granted the motion because (a) the Government had failed to prove that the defendant had endeavored to procure a loan from the bank to Karlee, (b) the Government had failed to prove willful misapplication of the bank's funds, (c) the Government had failed to prove any misstatement to the bank by defendant, and (d) the Government failed to prove that the defendant knowingly joined any conspiracy. The Government contends that the district court's rulings are erroneous, except as to count VI from which no appeal was taken, that they must be vacated, and that the jury's verdict be reinstated. We agree as to all counts except the willful misapplication charge contained in count III.

▆▆▆ The defendant asserts that we are foreclosed from reviewing the district court's judgment of acquittal for two reasons: (1) that there is no statutory authority to take such an appeal and (2) that even if there were, the double jeopardy clause would prohibit the appeal in this case. We find neither argument persuasive and hold that we have jurisdiction over this appeal under 18 U.S.C. § 3731 (1976).[7]

## II. COUNT I

Count I of the indictment charges that defendant, while employed as an officer of the Central Penn National Bank, a federally insured bank

---

**7.** Section 3731 provides that

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

The defendant points to certain language in Justice Stevens' concurring opinion in *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977), which supports the view that section 3731 prevents an appeal from a judgment of acquittal based on the merits of the case. 430 U.S. at 576, 97 S.Ct. at 1357 ("There is no statutory authority for a government appeal from a judgment of acquittal in a criminal case."). However appealing such an argument might be, we are precluded from adopting it for the Supreme Court has held that "the legislative history [of section 3731] makes it clear that Congress intended to remove *all* statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson*, 420 U.S. 332, 337, 95 S.Ct. 1013, 1019, 43 L.Ed.2d 232 (1975) (emphasis supplied). Following this line we have taken appeals from judgments of acquittal, *see United States v. Cahalane*, 560 F.2d 601, 603 n. 2 (3d Cir. 1977); *United States v. Davis*, 560 F.2d 144, 146–47 (3d Cir.), *cert. denied*, 439 U.S. 839, 98 S.Ct. 133, 54 L.Ed.2d 102 (1977). Thus, it is the law of this circuit that we have statutory authority to hear government appeals from judgments of acquittal. Unless the double jeopardy clause prevents this appeal, we have jurisdiction.

The Supreme Court has held that double jeopardy is not implicated in an appeal from a judgment of acquittal entered after a jury verdict of guilty because there is no possibility that the defendant will have to stand trial again for the same offense. *United States v. Wilson, supra; see United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). The defendant attempts to distinguish *Wilson* as involving merely a judgment of acquittal based on a technical imperfection in the prosecution. In this case it is asserted that the judgment was based on a substantive finding of insufficiency of evidence. We find this a distinction without meaning, for even though the trial court may have had a substantive base for its decision, the critical fact is that defendant will not twice be tried and thus will not twice be put in jeopardy for the same offense. If the Government prevails in this appeal, the jury's guilty verdict will be reinstated. Therefore, no double jeopardy problem is presented and we have jurisdiction over the appeal. *See United States v. Cahalane, supra; United States v. Davis, supra.*

did knowingly and unlawfully stipulate for, agree to receive and received a fee, commission, gift and thing of value, to wit: shares of stock in Greenmeadow Holding Company, a company which owned all of the stock of Karlee Corporation, for endeavoring to procure and procuring for Karlee Corporation and the stockholders of Greenmeadow Holding Company, through the warehousing account of Delaware Valley Mortgage and Realty Corporation at Central Penn National Bank, a loan and extension of credit in the approximate amount of $1,495,400 . . ..

In violation of Title 18, United States Code § 215.

To make out a violation of section 215,[8] the Government need only prove: (1) that the accused was an officer or employee of a bank, the deposits of which are insured by the Federal Deposit Insurance Corporation; (2) who agreed to receive or received something of value from another; (3) for endeavoring to procure or procuring for that other or anyone else; (4) a loan from the bank in which the accused was employed.

It is undisputed that at all pertinent times the defendant was an officer of Central Penn, the deposits of which were insured by the Federal Deposit Insurance Corporation.[9] The proof is equally certain that the defendant received a thing of value—capital stock in Greenmeadow Holding Company.[10] The difficult question we face, however, is whether the evidence is sufficient to prove either that the defendant procured or endeavored to procure a loan or that any loan in fact was made.

We conclude that the evidence, taken in the light most favorable to the Government, establishes that the defendant endeavored to procure a loan from the bank to Delaware Valley for the use of Greenmeadow/Karlee. We note that such proof is sufficient to make out a violation of section 215 even though the loan was procured for a company other than that which gave the fee or commission to the defendant. The district court found this evidence insufficient proof of the crime alleged in the indictment because it failed to prove either that the defendant endeavored to procure a loan from the bank or that the bank made such a loan to Greenmeadow/Karlee through the Delaware Valley warehousing line. We conclude that the evidence in the instant case is sufficient to show that the defendant, a bank officer, endeavored to procure and did procure a loan from the bank in which he was employed, in return for a fee, thing of value, or gift, and that this proof establishes an offense under section 215, even though the proceeds of the loan were delivered to a party other than the one which gave the fee. Any variation in proof of who received the loan is immaterial and harmless inasmuch as the indictment gave the defendant full and adequate notice of the charges against him. We therefore vacate the judgment of acquittal on count I.

### (A) *Sufficiency of Proof of a Loan*

The threshold question we must address is whether the proof at trial established a loan by Central Penn to either Delaware Valley or Greenmeadow/Karlee, for the failure to establish such an extension of credit would require judgment of

---

**8.** 18 U.S.C. § 215 (1976) provides in pertinent part:

> Whoever, being an officer [or] employee . . . of any bank, the deposits of which are insured by the Federal Deposit Insurance Corporation . . . except as provided by law, stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person, firm, or corporation, for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation, from any such bank . . . any loan . .

> shall be fined not more than $5,000 or imprisoned not more than one year or both.

**9.** The parties stipulated as to this fact on all counts.

**10.** Stock certificates in Greenmeadow listed in defendant's name, evidencing ownership of 20 percent of the company, were admitted at trial along with testimony by the officers of Greenmeadow that defendant was given his shares by the others.

acquittal even if there were no variation in proof at trial from the indictment. Proof that a bank made a loan to someone because of the actions of a bank officer is by itself insufficient to make out a violation of section 215; the loan must be found emanating *from the bank in which the defendant is employed.* Thus, in *United States v. Gerken,* 182 F.Supp. 738 (E.D.N.Y.1960), the court dismissed a section 215 charge against the defendant bank employee for his action in securing a loan for a company from a bank other than the one for which he worked.

Defendant characterizes the loan in this case as identical to that of *Gerken* and maintains that the indictment should have been dismissed. His contention is that the only loan made in this case was the construction loan from Delaware Valley to Greenmeadow/Karlee and that none of his actions in regard to such a loan could be a violation of the statute.

The Government submits, however, that Central Penn in fact made a loan to Greenmeadow/Karlee. This contention is based on the theory that Delaware Valley was a mere conduit by which to transfer the funds to the actual borrower—Greenmeadow. The Government maintains that courts must look behind the facade of a transaction to establish the actual relationship between the bank and the eventual recipient of its funds. Citing *United States v. Bristol,* 473 F.2d 439 (5th Cir. 1973), in which a bank examiner was found guilty of accepting a loan from a bank official in violation of 18 U.S.C. § 213 (1976), the Government maintains that the loan to Delaware Valley must be viewed for what it truly is—a loan to Greenmeadow/Karlee.

In *Bristol,* the Government's proof that the examiner received payment through a non-banking corporation *controlled* by the bank official was found sufficient to make out a loan *from the bank* to the examiner. Therefore, the Government reasons by analogy that the loan to Delaware Valley, which by virtue of interlocking officers was substantially the same as Greenmeadow, would be sufficient to prove a loan from the bank

to Greenmeadow. We see the transaction in the instant case as distinguishable from both that of *Gerken* and that of *Bristol.*

■ Unlike *Gerken,* in which the officer's bank was in no way involved in the transfer of funds to the beneficiary, Central Penn, the defendant's employer, made the loan to and provided the funds for Delaware Valley. The transfer of those funds was critical, for without that transfer no loan to Greenmeadow/Karlee could have been consummated. Unlike the company controlled by the bank official in *Bristol,* Delaware Valley is not a mere shell. It is a corporation wholly separate and distinct from Greenmeadow and the *ownership* of the companies is entirely independent. The officers of the two overlapped, but this alone is not enough to provide a basis for concluding that the corporations were identical and that a loan to Delaware Valley is the equivalent of a loan to Greenmeadow/Karlee.

An examination of the facts adduced at trial demonstrates that two independent relationships were created in the Greenmeadow/Karlee venture: first, Delaware Valley agreed to grant a loan to Karlee for the development of the property, and second, Delaware Valley borrowed the funds for this loan from Central Penn through its warehousing line. Even though the Government did not introduce documentary proof of the operation of this line, the evidence is sufficient to establish that extensions of credit to Delaware Valley on the line were not mechanical and automatic. Although Delaware Valley had a line of credit with Central Penn up to $2,000,000 for its warehouse line, whenever Delaware Valley drew funds against the line of credit it was required by the bank to support the draw with adequate documentation of the bona fides of the underlying loan transaction of Delaware Valley, supported by a commitment letter from a permanent lender. The mortgage department, under the defendant's supervision, had responsibility to assess each request for payment transmitted on the line. That the credit line was established prior to the request for funds for the Greenmeadow/Karlee line is irrele-

vant, for Central Penn had the right to consider each request separately and evidently could reject any request for an advance if a Delaware Valley transaction was not backed with proper documentation. Affirmative action on each request constituted a loan. Finally, a substantial payment in at least one instance was made directly from the bank to a Greenmeadow/Karlee account at another bank. Therefore, it appears to us beyond a doubt that the evidence at trial was adequate to establish a loan from Central Penn to Delaware Valley for Greenmeadow/Karlee.

At one point the district court apparently held that the Government need not prove a direct loan to Greenmeadow/Karlee from Central Penn and that all it need demonstrate was that the bank had authority to disapprove the loan by Delaware Valley or that the defendant's help was necessary to insure no interference by the bank in the transaction. *United States v. Schoenhut,* 432 F.Supp. 470, 477 (E.D.Pa.1977). As we have shown, the evidence of the bank's control was sufficient to make out the proof required by the district court.[11] A closer review of the district court's opinion, however, demonstrates that the court did in fact hold that more was necessary and that the evidence would have to be sufficient to prove a direct loan from Central Penn to Greenmeadow/Karlee as required by the indictment. Because it was not, the court entered a judgment of acquittal.[12]

■ Assuming the proof to be insufficient to establish this direct loan to Greenmeadow/Karlee, the evidence did show a direct loan to Delaware Valley. The Government, however, failed to prove all of the allegations of the indictment precisely as stated. Such a variance may be fatal if it destroys the defendant's basic right to be tried only on the charges presented in the indictment. *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). However, not all variances are so strictly construed.

■ We have held that judgment of acquittal as a matter of law is warranted only in a case in which the variance is a "modification in the elements of the crime charged." *United States v. Somers,* 496 F.2d 723, 744 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974), *see United States v. Crocker,* 568 F.2d 1049, 1059–60 (3d Cir. 1977). However, if "the variance does not alter the elements of the offense charged, we will focus upon whether or not there has been prejudice to the defendant." *United States v. Somers, supra,* 496 F.2d at 744. Unless substantial rights of the defendant are affected by the variance, he has suffered no harm. *See* F.R.Crim.P. 52(a).

■ A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or

---

11. The district court asserted that the Government had the burden of proving either that the bank had review power over loans made by Delaware Valley or that the defendant's participation was *necessary* to insure the transfer of funds to Karlee. The court stated that the evidence was insufficient to prove any duty on the part of the bank to inspect the Greenmeadow/Karlee construction site, and that this failure of proof prevented establishment of a control relationship between the bank and the beneficiary of a Delaware Valley loan. *United States v. Schoenhut, supra,* 432 F.Supp. at 477. The court, however, failed to consider the mortgage department loan policy manual written by the defendant himself and the testimony of the various witnesses of the bank's control over the warehouse line. Given these additional facts, the evidence of the bank's control over

the line becomes clear and the characteristics of a loan are established.

12. The district court stated that there was no "proof that a loan was secured from Central Penn National Bank," and concluded that "the government . . . failed to introduce into evidence any testimony upon which a jury could make the determination that the loan referred in count I of the indictment came from Central Penn National Bank." *United States v. Schoenhut, supra,* 432 F.Supp. at 482. Therefore, the court granted the judgment of acquittal and although the court had at one time stated that it would not require direct proof of a loan from the bank to Greenmeadow/Karlee, its holding apparently was based in part on such a conclusion.

surprised at trial, (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense. *United States v. Somers, supra,* 496 F.2d at 746; *see United States v. Anton,* 547 F.2d 493, 496 (9th Cir. 1976); *United States v. Anderson,* 532 F.2d 1218 (9th Cir. 1976). All other variances must be considered harmless error. *See* F.R.Crim.P. 52(a).

▬▬▬▬ This is not a case in which the variance concerns a basic element in the charge against the defendant. Unlike *Stirone v. United States, supra,* and *United States v. Crocker, supra,* the indictment in this case gave full notice to the defendant of the charge against him. In *Stirone,* the defendant was indicted and convicted of interference with the interstate movement of sand for the mixture of concrete to a steel plant being built in Pennsylvania. The court allowed evidence of defendant's interference with shipment from the plant to points outside of Pennsylvania and charged the jury on this act. The Supreme Court held that such actions amended the indictment and reversed the conviction. Similarly, in *Crocker,* this court held that the district court had committed reversible error in allowing the Government in a perjury prosecution, to prove that the defendant's statements were untruthful "in an entirely different manner" than that specifically charged by the grand jury. 568 F.2d at 1060. However, unlike *Stirone* or *Crocker*, in this case, the indictment accurately charged *all* of the facts which were proven at trial, though proven in a slightly different manner than that alleged.

Here, the indictment alleged a loan from Central Penn to Karlee through the Delaware Valley warehousing line. The proof at trial was of a loan from Central Penn to Delaware Valley for the use and benefit of Greenmeadow/Karlee. Defendant was clearly apprised of the charges against him and could not have been surprised by the actions at trial. *United States v. Evans,* 398 F.2d 159, 166 (3d Cir. 1968) (variance harmless because defendant did not show that the variance impaired his ability to defend himself or identify the nature of the charge). The indictment need not be read technically, but should be construed with an appreciation of the existing realities. *United States v. Anderson, supra,* 532 F.2d at 1222. When so read, the variation in the instant case is harmless. *See United States v. Anderson, supra,* (defendant indicted for transportation of stolen securities interstate; indictment charged him with transport of "stock" interstate; stock not within the definition of security and proof was that the stock certificates were counterfeit; court held variance harmless); *Heisler v. United States,* 394 F.2d 692 (9th Cir.), *cert. denied,* 393 U.S. 986 (1968) (defendant indicted for passing a counterfeit 20 dollar bill; proof that he passed a counterfeit 10 dollar bill; held harmless); *Hall v. United States,* 372 F.2d 603 (8th Cir.), *cert. denied,* 387 U.S. 923, 87 S.Ct. 2040, 18 L.Ed.2d 979 (1967) (indictment charged interstate transfer of a fraudulent check from Missouri to Arkansas; evidence proved the opposite; held harmless); *Cortez v. United States,* 328 F.2d 51 (5th Cir.), *cert. denied,* 379 U.S. 848, 85 S.Ct. 89, 13 L.Ed.2d 52 (1964) (indictment referred to a check drawn by Moore Service, Inc.; proof of a check drawn by Moore-Cutler Transportation, Inc.; held harmless).

▬▬▬ Because the essence of the offense under section 215 is endeavoring to procure a loan from a bank for a thing of value by an officer of the bank, when the proof establishes that a bank officer endeavored to procure such a loan, a variance from the indictment in proof of who in fact received the loan is immaterial, where as here the officer was "informed of the nature of the charge against him so that he was enabled to present his defense, was not taken by surprise and is protected against another prosecution for the same offense." *Ferrari v. United States,* 169 F.2d 353, 354 (9th Cir. 1948); *see Berger v. United States,* 295 U.S. 78, 81, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). We therefore conclude that the variance in the instant case was harmless and that defendant's rights were substantially preserved.

**(B)** *Sufficiency of Proof of Procurement*

The district court held that the proof was insufficient to show that defendant had procured or endeavored to procure a loan from Central Penn. The judge stated that the Government did not prove that it was *necessary* to enlist the aid and support of the defendant to secure the loan, *United States v. Schoenhut, supra,* 432 F.Supp. at 477; that the Government did not prove that defendant knew of the forgeries in the papers of the Karlee stock purchase and that the officers of Delaware Valley were hiding their identities from Mullin and Lonergan, *id.* at 480; that the defendant's knowledge of the relationship of the Delaware Valley officers to Greenmeadow/Karlee did not constitute proof of procuring a loan, for the relationship was not illegal, *id.*; and that defendant's advice to Heimbecker and the others was not procurement, but was perfectly innocent in the absence of knowledge that they were concealing the true identity of the Greenmeadow principals from Delaware Valley, *id.* at 482.[13]

■■■■■ We conclude that the evidence is sufficient to prove the defendant's endeavor to procure a loan from Central Penn. The district court overemphasized the need for proof that defendant *knew* of the fraudulent schemes and forgeries committed by Heimbecker and the others. The defendant's knowledge of these acts is irrelevant in assessing his own action or inaction in securing a loan from his bank. Nor is proof that his complicity was necessary to obtain the loan an essential element of the offense, for section 215 prohibits mere *endeavoring* to procure a loan for a thing of value and does not require the ability to do so. The evidence conclusively demonstrates defendant's concealment of his interest in the venture and the true identities of the others. This concealment is a sufficient basis upon which to predicate a conclusion that defendant made a willful attempt to secure the loan to Delaware Valley.

In the light most favorable to the Government, the evidence reveals (1) that Central Penn's funds were transmitted to Greenmeadow/Karlee; (2) that Central Penn had the contractual power to exercise control not only over the Delaware Valley warehouse line, but over the inspections of the Greenmeadow sites as well, in accordance with the manual written by the defendant; (3) that the defendant was in charge of Central Penn's mortgage department and knew of the lack of capital in Greenmeadow/Karlee and knew the true identities of the officers; (4) that the defendant accepted Greenmeadow stock and had a financial interest in the outcome of the loans made by Central Penn; (5) that the defendant gave advice to Pierce and Heimbecker about using the Delaware Valley line to secure funds for Greenmeadow/Karlee and actually visited the sites after receiving the stock; and (6) *that the defendant told no one at the bank of his interest* in the venture even though he knew bank funds were being expended. All of the evidence, defendant's action and inaction, and the reasonable inference to be drawn by the jury that Central Penn would have thought twice before allowing the transfer of funds to Delaware Valley had defendant informed the bank of his interest in the transaction and of the interlocking relationship between Greenmeadow and Delaware Valley are sufficient to show defendant's endeavor to procure the bank loan.

## III. COUNT III

Count III of the indictment charges that the defendant, while employed as an officer of Central Penn National Bank

did knowingly and wilfully misapply monies, funds and credits of said bank, in that [he] authorized, and caused to be granted, a construction loan . . . in the approximate amount of $1,495,400,

---

**13.** The court refused to consider the Heimbecker hearsay testimony that the defendant was given his stock because of his help in procuring the loan. *United States v. Schoenhut, supra,* 432 F.Supp. at 483. We hold later in this opinion that such testimony should have been considered *against the defendant, see* part V, *infra,* but even without the testimony, the evidence is sufficient to show that defendant endeavored to procure the loan.

through the warehousing account of Delaware Valley Mortgage and Realty Corporation at Central Penn National Bank to Karlee Corporation, a company in which [he] was a director and . . . a stockholder . . . said loan was authorized and supervised without [his] revealing to Central Penn National Bank his own interest in Karlee Corporation . . .; and in that [he] authorized, and caused to be granted, the above loan, well knowing that certain documents supplied to Central Penn National Bank by Karlee Corporation . . . were forged . . . . In violation of Title 18, United States Code § 656.

■■■■■ To sustain a conviction of willful misapplication of bank funds under section 656[14] the Government must prove (1) that the defendant was an officer, (2) of a federally connected bank, (3) who willfully misapplied funds at the bank, and (4) that he made the misapplication with the intent to injure and defraud the bank. *United States v. Schmidt*, 471 F.2d 385 (3d Cir. 1972) (per curiam). Intent to injure or defraud a bank exists whenever the defendant acts knowingly and the result of his conduct would be to injure or defraud the bank, regardless of his motive. *Id.* at 386; *see United States v. Tokoph*, 514 F.2d 597, 603 (10th Cir. 1975). Such intent may be inferred from facts and circumstances shown at trial and is basically a fact question for the jury. *United States v. Tokoph, supra*, 514 F.2d at 603. Reckless disregard of the interests of the bank is equivalent to intent to injure or defraud. *United States v. Wilson*, 500 F.2d 715, 720 (5th Cir. 1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975); *United States v. Stevison*, 471 F.2d 143, 145 (7th Cir. 1973).

The district court granted judgment of acquittal on this count (1) because the Government failed to establish a loan from Central Penn to Greenmeadow/Karlee and (2) because the evidence failed to prove defendant's knowledge of any forgeries or fraudulent documents sent to the bank in connection with any loan. *United States v. Schoenhut, supra*, 432 F.Supp. at 483–84. Although we have found that a loan was in fact granted by the bank, for the second reason expressed by the district court and because of the failure of the Government to establish defendant's intent to injure or defraud the bank, we affirm the judgment of acquittal on this count.

■■■■■ We have held that the defendant endeavored to procure a loan from Central Penn to Delaware Valley for the use and benefit of Greenmeadow/Karlee. This activity may have constituted a crime under section 215, but it does not without more amount to a willful misapplication of funds under section 656. Section 656 penalizes willful misapplication, but that term must be placed in context with the other acts prohibited by the section. It proscribes actions of one who "embezzles, abstracts," and "purloins." When this is read together with willful misapplication, it is evident that the *mens rea* for the crime is not fulfilled by mere indiscretion or even foolhardiness on the part of the bank officer. His conduct must amount to reckless disregard of the bank's interest or outright abstraction of funds. An examination of the cases under this section shows that defendant's actions do not rise to that level.

■■■■■ Prosecutions of bank officers for their actions in securing loans listed for one party but intended for another have fallen into three general categories: (1) cases in which the bank officer knew that the named debtor was fictitious or that the debtor was unaware of the use of his name for the debt; (2) cases in which the bank officer knew that the named debtor was financially unable to pay back the loan; and (3) cases in which the bank officer

---

14. 18 U.S.C. § 656 (1976) provides in pertinent part:

Whoever being an officer . . . or employee of . . . any Federal Reserve bank, member bank, national bank or insured bank, . . . embezzles, abstracts, pur-loins or willfully misapplies any of the moneys, funds or credits of such bank . . . shall be fined not more than $5,000 or imprisoned not more than five years or both . . .

assured the named debtor that it would not be obligated to repay the loan in the event of a default and that the bank would look solely to the intended beneficiary of the loan for repayment. *United States v. Gens,* 493 F.2d 216, 221–22 (1st Cir. 1974); *see United States v. Tokoph, supra,* (defendant arranged $90,000 loan for a company; arranged for bank to deliver $100,000 instead, $10,000 split as a kickback for arranging the transaction); *United States v. Schmidt, supra,* (defendant arranged loans for an individual through various third parties after the individual had exceeded his credit limit); *United States v. Stevison, supra,* (defendant cashed checks on accounts known by her to have insufficient funds, also cashed checks on phony accounts); *Williamson v. United States,* 332 F.2d 123 (5th Cir. 1964) (defendant advanced credit to an automobile dealer on loans he knew to be spurious). These cases all involve distinct actions by the officer to fraudulently obtain funds for others in violation of the bank's policies. This case involves nothing more than inaction by the defendant in allowing the transfer of funds to Delaware Valley when his action might have prevented the loan. That he had a financial interest in the beneficiary of the loan does not amount to an intent to injure or defraud under section 656. Rather, this case is similar to *United States v. Gens, supra,* in which the defendant loaned money taking no security on eight separate occasions, knowing that the proceeds would be turned over to another person. The court held that the evidence was insufficient to prove willful misapplication. *Cf. United States v. Gallagher,* 576 F.2d 1028 (3d Cir. 1978) (section 656 conviction reversed because of erroneous charge; indication that defendant bank officer must have guilty knowledge of fraud on the bank).

It is true that defendant failed to make his dealings with Greenmeadow/Karlee known to the bank, but in the absence of proof that he knew of the false and fraudulent practices being committed by the officers of Delaware Valley, the evidence is insufficient to prove beyond a reasonable doubt defendant's intent to injure or defraud. *United States v. Wilson, supra.*

## IV. COUNT VIII

Count VIII of the indictment states that defendant, while an officer of Central Penn National Bank

did knowingly and unlawfully, with intent to defraud the bank, make a false report, statement and entry into the books of said bank [by supplying] false information to said bank in a questionnaire supplied him by said bank: to wit: [he] stated that he had no interest, financial or otherwise, in any company which borrowed money or was a customer of said bank, well knowing this statement to be untrue; [he] further stated that he had not received any commissions, fees, etc. from any source other than said bank in any transaction to which said bank was a party . . ., well knowing this statement to be untrue; [he] further stated that he had not acquired any stock or securities which were available to him only by reason of his employment with said bank . . ., well knowing this statement to be untrue. In violation of Title 18, United States Code, § 1005.

The critical element of this offense is proof that the defendant knowingly made a false statement in an official report of the bank with intent to defraud the bank or deceive any of its officers.[15] The Government entered the following document, a conflict of interest questionnaire sent by the bank to the defendant and other bank employees, into evidence. To each of the

---

**15.** 18 U.S.C. § 1005 (1976) provides in pertinent part:

> Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, . . . or to deceive any officer of such bank . .
>
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Defendant was also indicted under this section in count VI for allowing documents, known by him to be forged and fraudulent, to support the extension of credit to Delaware Valley. The district court found no evidence to support this and granted judgment of acquittal. *United States v. Schoenhut, supra,* 432 F.Supp. at 484-85. The Government does not appeal this judgment.

questions of the questionnaire the defendant answered in the negative.

1. Do you, or anyone in your immediate family, have any interest, financial or otherwise, in any company or organization which borrows from or is a customer of the Company? . . .

5. During the past year, have you received any gifts, discounts or other benefits, including loans, from anyone who borrows from or is a customer of the Company? . . .

6. During the past year, have you acquired any stock or property which were available to you only by reason of your employment with the Company? . . .

. . . . .

The district court, based on its assessment of the loan transaction to Greenmeadow/Karlee, the company in which the defendant had an interest, concluded that Greenmeadow was not a customer of the bank and that therefore defendant did not answer falsely any question on the survey. Judgment of acquittal was entered on this basis. *United States v. Schoenhut, supra,* 432 F.Supp. at 485–86.

 This reasoning, however accurate, is only relevant to assessing defendant's answer to question one, asking if he had an interest in a customer of the bank. Defendant's answers to the other questions asked were not specifically analyzed by the court. In completing such an analysis, we hold that the evidence would support defendant's conviction for falsely answering question six.

The introduction to the questionnaire specifically cautioned bank employees that any "question as to [a] possible conflict of interest should be resolved in consultation with the staff member's supervising officer." No question exists that the defendant did not consult with anyone at the bank about his answers to the questions asked, which at the least presented a possibility of conflict to the defendant.

The proof is strong that defendant misled the bank in his response to question number six which asked whether he had received any stock by reason of his employment with the bank. That question seems tailormade to the facts of this case. The record showed that Heimbecker made a "gift" of the Greenmeadow stock to the defendant, ostensibly for the purpose of rewarding him for past services. Even if given for past services, the gift was still made because of the defendant's status as an employee of the bank. The jury, knowing Heimbecker was the chief executive officer of a customer of the bank and the driving force behind the Greenmeadow/Karlee transaction could reasonably have made the inference that the defendant *knew* that the gift was given to him, if not for his actual procurement of the loan, then at least because of his crucial position at the bank.[16]

After considering the evidence as a whole and the inferences that reasonably can be drawn from it, we conclude that there was an adequate basis for the jury verdict and we therefore vacate the judgment of acquittal on this count.

## V. COUNT IX

Count IX charges the defendant with conspiring with others to violate 18 U.S.C.

---

**16.** The hearsay testimony of Heimbecker was that the defendant was given his initial shares of stock in Greenmeadow because of his actions in helping obtain financing and that his share was equalized with the others as compensation for his role in the cover-up of the false commitment letters. We hold that this evidence was admissible, *see* part V, *infra.* Given this additional proof, the guilty verdict is adequately backed by sufficient evidence.

Additionally, the proof at trial established that defendant falsely answered question five which asked whether the defendant had received any benefits, including loans, from any-

one who borrowed from or was a customer of the bank. Delaware Valley was a customer of the bank and Delaware Valley granted a construction loan to Greenmeadow/Karlee, a company in which defendant was a one-fifth owner. On the record adduced at trial, the jury would have been justified in finding that defendant falsely answered this question by denying receipt of a benefit or loan from a customer of the bank. However, because the indictment did not specifically mention defendant's answer to this question, we do not base our decision on his response and rely solely on his answer to question six.

§§ 215, 656, 1005 (1976), in contravention of 18 U.S.C. § 371 (1976).[17] The indictment stated that the purpose of the plan was for the defendant to agree to procure a loan for Greenmeadow/Karlee, knowingly misapply bank funds, and make materially false reports to the bank.

The district court held that as it had granted judgment of acquittal on all of the other counts and as it had held that no substantial evidence existed to show that the defendant had joined the conspiracy formed by Pierce, Inverso, Nirenberg, and Heimbecker, it would grant judgment of acquittal. *United States v. Schoenhut, supra,* 432 F.Supp. at 486. Because we believe that the evidence, viewed in the light most favorable to the verdict, supports a finding that the defendant conspired at least to procure funding for Greenmeadow/Karlee, we vacate the judgment of acquittal.

"Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstance.'" *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *citing United States v. Manton,* 107 F.2d 834, 839 (2d Cir. 1938), *accord, United States v. Westover,* 511 F.2d 1154, 1156 (9th Cir.), *cert. denied,* 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975). Once the existence of a conspiracy is established, only slight evidence is required to connect any given defendant with it. *United States v. Kates,* 508 F.2d 308, 310 (3d Cir. 1975). This means that after a jury has found a defendant guilty beyond a reasonable doubt in a conspiracy case, "an appellate tribunal may not substitute its inferences from the evidence for those drawn by the fact finder" as long as there is some evidence to support the verdict. *United States v. Cooper,* 567 F.2d 252 at 253 (3d Cir. 1977). When the threshold requirement of demonstrating a likelihood of an illicit association

by any defendant with a conspiracy is fulfilled, hearsay declarations of any of the conspirators are admissible against the others. *United States v. Bey,* 437 F.2d 188, 190 (3d Cir. 1971). The district court held that aside from certain hearsay statements of Heimbecker, there was no independent evidence of defendant's joining a conspiracy. It further held that the hearsay would not be considered as part of the evidence against the defendant, and that he could not be found a co-conspirator. *United States v. Schoenhut, supra,* 432 F.Supp. at 481.

Our review of the record convinces us that there was sufficient evidence to support a finding that there was conspiracy in which defendant participated, even in the absence of admission of the hearsay. The admission of that testimony makes the verdict even more clear.

The record demonstrates conclusively that there was an on-going conspiracy involving Heimbecker, Pierce, Inverso, and Nirenberg. Defendant had substantial dealings with all of this group through his position at the bank. He was given an equal membership with the others in Greenmeadow, a company controlled by the conspirators. Additionally, the record reveals that defendant's bank made funds available to the conspirators through the Delaware Valley line, that defendant had responsibility over the line, that defendant knew of the nature of the activities of the Greenmeadow principals, that defendant did not reveal the Greenmeadow-Delaware Valley relationship or his own personal stake in the venture to anyone at the bank, and that he gave financial advice to Heimbecker and Pierce about how they might obtain funds from Central Penn by putting the transaction on the warehousing line. Such acts, though some might be innocent in themselves, when viewed as a whole tie the defendant inextricably to the conspiracy.

---

17. 18 U.S.C. § 371 provides in pertinent part:
 If two or more persons conspire either to commit any offense against the United States or to defraud the United States, or any agency thereof in any manner or for any purpose, and

one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 \* \* \* \* \* \*

In *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), the Supreme Court indicated that a "stake in the venture" may itself be an element in the proof of a conspiracy. 319 U.S. at 713, 63 S.Ct. 1265. Given the defendant's stake in the venture in the instant case and the other factors listed above, the jury would have been justified in drawing the inference from the circumstantial evidence that the defendant had joined the conspiracy. Certainly such evidence is sufficient to provide the "likelihood of an illicit association" which would permit consideration of the hearsay evidence of Heimbecker. *United States v. Bey, supra.*

When Heimbecker's hearsay statements that the defendant was given his stock because of his help in securing financing and because of his assistance in the cover-up are considered along with the other evidence, sufficient proof of defendant's participation in the conspiracy is shown. Taking the evidence in the light most favorable to the verdict, the finding of guilty must be reinstated.

## VI. CONCLUSION

Taking the evidence in the light most favorable to the Government, we hold:

(1) Sufficient evidence exists to sustain the defendant's conviction on count I of the indictment for endeavoring to procure a loan from Central Penn to Delaware Valley for Greenmeadow/Karlee. Any variance in the proof at trial from the allegations of the indictment was harmless.

(2) Sufficient evidence exists to sustain the defendant's conviction for making false statements in an official report to the bank by virtue of his failure to acknowledge receipt of capital stock in Greenmeadow given to him by virtue of his employment at the bank.

(3) Sufficient evidence exists to sustain defendant's conviction for conspiracy to knowingly receive a thing of value for endeavoring to produce a loan from the bank.

(4) Insufficient evidence exists to sustain defendant's conviction for willful misapplication of bank funds.

The district court's judgment of acquittal on count III of the indictment will be affirmed. The district court's judgment of acquittal on counts I, VIII, and IX will be vacated with instructions to reinstate the jury's verdict of guilty on those counts.